**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: LOWER BUCKS HOSPITAL,** | : | |
| **Debtor** | : | |
| _____ | : | **CIVIL ACTION** |
| | : | **NO. 12-3399** |
| **THE BANK OF NEW YORK, MELLON** | : | |
| **TRUST COMPANY, NA as Indenture** | : | **CIVIL ACTION** |
| **Trustee,** | : | **NO. 12-3752** |
| **Appellant** | : | |
| **v.** | : | |
| | : | |
| **LEONARD BECKER,** | : | |
| **Appellee** | : | |

**MEMORANDUM OPINION**

Savage, J.                                                    January 2, 2013

In this appeal from the Bankruptcy Court's refusal to approve, as part of a reorganization plan, a third party release provision that would have precluded the Bondholders from bringing any claims against the indenture trustee, we must decide whether the Bankruptcy Court erred in determining that the notice to the Bondholders was inadequate.   As a corollary, we must decide whether the Bondholders' acceptance of the third party release during the settlement motion process constituted a consensual release, and whether the plan should have been confirmed with the third party release provision.

**Factual and Procedural Background[1]**

In 1992, Lower Bucks Hospital ("LBH")[2] entered into a multi-party municipal bond

---

[1] The factual and procedural background is thoroughly detailed in the Bankruptcy Court's memorandum opinion.   *See In re Lower Bucks Hosp.*, 471 B.R. 419, 425-43 (Bankr. E.D. Pa. May 10, 2012) (R. 2).   We recite only those facts bearing on the issues presented in this appeal.

[2] Lower Bucks Hospital operates a community hospital located in Bristol, Pennsylvania.   It is the sole shareholder of four non-profit corporations, including Lower Bucks Health Enterprises, Inc. and Advanced Primary Care Physicians.

financing transaction to refinance some of its outstanding debt obligations and to finance capital improvement projects.   The Borough of Langhorne Manor Higher Education and Health Authority (the "Authority") issued the bonds and loaned the bond proceeds to LBH. In the Loan and Security Agreement, LBH granted broad indemnification rights to the Authority which, in turn, assigned most of its rights to the original indenture trustee, Continental Bank.[3]   The Bank of New York, Mellon Trust Company ("BNYM") is the successor to Continental Bank.

Two agreements from the bond financing transaction are relevant.   In the Loan and Security Agreement, which governs the relationship between LBH and the Authority, LBH agreed to indemnify the Authority against "any and all claims" arising out of the financing transaction.[4]   The scope of the indemnity is broad and requires LBH to assume and pay for the defense of any claim against the Authority.   It excludes only claims for "malfeasance or nonfeasance in office, bad faith, gross negligence, wilful misconduct, fraud or deceit."[5]   In another section of the Loan and Security Agreement, LBH agreed to indemnify the Trustee, now BNYM as successor to Continental Bank, against "any liabilities" arising out of its powers and duties.[6]   Excluded are liabilities caused by the

---

[3] Section 101(28) of the Bankruptcy Code defines "indenture" as a "mortgage, deed of trust, or indenture, under which there is outstanding a security . . . constituting a claim against the debtor, a claim secured by a lien on any of the debtor's property, or an equity security of the debtor."   11 U.S.C. § 101(28). The Bankruptcy Court determined that although the indenture trustee's duties are not the same as those of a traditional trustee, BNYM was responsible for exercising its rights and powers under the Indenture for the benefit of the Bondholders.   *In re Lower Bucks Hosp.*, 471 B.R. at 452-53.

[4] Loan and Security Agreement, § 11.4(b) at 52 (R. 132).

[5] *Id.*

[6] Loan and Security Agreement, § 11.4(e) at 54.

Trustee's "gross negligence, or wilful misconduct."[7]

The Trust Indenture, which defines the respective rights and obligations of the Authority and the Indenture Trustee, originally Continental Bank and later BNYM, limits the Trust Indenture's liability to the Bondholders to conduct that is willful or negligent.[8]

On January 13, 2010, LBH filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[9]   At that time, LBH owed approximately $26 million to the Bondholders in outstanding principal, plus accrued interest.

On April 30, 2010, LBH commenced an adversary proceeding against BNYM, contending that the security interest created by the Loan and Security Agreement was not perfected at the time of LBH's bankruptcy because BNYM and its predecessors had failed to file valid UCC-1 financing statements after LBH changed its name in 1997 and 2006.[10] BNYM filed the financing statements properly identifying the debtor on October 16, 2009, more than three years after the second name change.   LBH contended that because BNYM perfected its security interest within ninety days of LBH's filing its Chapter 11 petition, any lien created by BNYM was avoidable under the Bankruptcy Code.   Thus, if LBH prevailed in the adversary proceeding, the Bondholders would lose their secured creditor status under 11 U.S.C. § 547(b).

---

[7] *Id.*

[8] Trust Indenture, § 11.03 at 62 (R. 131).

[9] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[10] In 1997, LBH changed its name to "Temple Lower Bucks Hospital."   On May 12, 2006, LBH changed its name back to "Lower Bucks Hospital."

On August 12, 2011, after more than a year of litigation, BNYM and LBH reached a settlement of the adversary proceeding.   The settlement stipulation provided that in return for deeming the Bondholders secured creditors, the debt owing them would be reduced from $26 million to $8.15 million.   As part of the settlement, LBH and BNYM gave mutual releases and agreed to dismiss the adversary proceeding as of the effective date of the reorganization plan.[11]   The settlement stipulation also contained a provision that purported to release BNYM from "any and all claims and causes of action arising under or in any manner related to the Bond Documents . . . by any and all parties, including without limitation all Bondholders . . . ."[12]   This provision is central to the dispute in this appeal.

On September 14, 2011, the Bankruptcy Court held a hearing to consider approval of the settlement.   During the hearing, the Court specifically noted that it did not view the settlement as having any preclusive effect on suits by the Bondholders against BNYM for

---

[11] *In re Lower Bucks Hosp.*, 471 B.R. at 429-30.

[12] *In re Lower Bucks Hosp.*, 471 B.R. at 430 (referring to paragraph 8(a)(ii)(B) of the settlement stipulation).   The third party release provision reads as follows:

> **Release - Bond Documents**.   In furtherance, and not in limitation of, the various releases and discharge provisions contained in the Plan, the occurrence of the Effective Date shall constitute a release of any and all claims and causes of action arising under or in any manner related to the Bond Documents against the Debtors, each of the Debtors' estates, and the Bond Trustee by any and all parties, including without limitation all Bondholders, to the extent permitted by applicable law. The Debtors intend to present the Bankruptcy Court with a proposed form of Confirmation Order that provides that all claims and causes of action of Bondholders against the Bond Trustee arising under or in any manner related to the Bond Documents are released and discharged.

First Amended Joint Chapter 11 Plan of Reorganization of Lower Bucks Hospital, Lower Bucks Hospital Enterprises, Inc. and Advanced Primary Care Physicians at 47, *In re Lower Bucks Hosp.*, Bankr. E.D. Pa. No. 10-10239 ("Bankr. Docket") (Doc. No. 1309) (R. 20).

actions outside the Bankruptcy Court.[13]   Nonetheless, that day, the Court entered the

parties' proposed order, including the provision releasing all claims against BNYM.[14]

Neither LBH nor BNYM brought to Bankruptcy Judge Eric Frank's attention the

third party release provision and its significance at the September 14, 2011 hearing.[15]

LBH's counsel did not mention the third party release.[16]   When Judge Frank voiced

concerns about making findings concerning BNYM and its relationship to the

Bondholders, LBH's counsel deferred to BNYM's attorney, who mentioned the third party

release in passing.[17]   The attorneys did not advise Judge Frank that among the claims to

be settled were the Bondholders' claims against BNYM.[18]   Only when Becker, who held

$90,000 of the bonds at issue, moved for reconsideration and objected to confirmation of

the plan did Judge Frank become aware of the significance of the third party release.

On September 27, 2011, LBH filed a proposed plan of reorganization and a

---

[13] Hr'g Tr. 38:1-39:12 (Sept. 14, 2011) (R. 89); *see also In re Lower Bucks Hosp.*, 471 B.R. at 435.

[14] Order, Bankr. Docket (Doc. No. 1320) (Sept. 14, 2011) (R. 141).   The order was entered on September 15, 2011.   BNYM refers to this order as the September 15, 2011 Order.   Br. of Appellant at 18 (Doc. No. 26).

[15] *In re Lower Bucks Hosp.*, 471 B.R. at 432-33.

[16] *Id.* at 432.

[17] Hr'g Tr. 8:23-9:4 (Sept. 14, 2011); *In re Lower Bucks* Hosp. 471 B.R. at 432-33.

[18] Judge Frank's words best describe his discontent:

> In retrospect, what is perhaps most disappointing is that in a hearing filled with opportunities for counsel to reveal the existence of the Third Party Release–a provision that BNYM now contends was a critical part of the global settlement and that the Debtors acknowledge was the product of intense negotiation–at no point did any attorney disclose candidly that the true purpose of the Proposed Findings had nothing to do with collateral estoppel or with providing some vague "comfort" to the Indenture Trustee, but rather, that the findings were requested to provide a foundation for approval of the Third Party Release.   Whether purposeful or not, counsel's conduct served to conceal this material issue from the court.

*In re Lower Bucks Hosp.*, 471 B.R. at 435-36.

disclosure statement.   The relevant third party release provision was embedded in both of these documents – page forty-two of the single-spaced forty-seven page proposed plan, and page fifty-five of the single-spaced sixty-two page disclosure statement.[19] After Judge Frank approved the disclosure statement the next day, BNYM sent a notice to the Bondholders reporting that the disclosure statement had been approved by the Court. In October 2011, ninety-five Bondholders holding approximately $13.5 million of the bonds at issue, voted on the proposed plan.   Of those, ninety Bondholders, holding less than half the value of all outstanding bonds at issue, voted to accept the plan.   Five Bondholders, including Becker, who held $90,000 of the bonds at issue, voted to reject it.

On October 14, 2011, Becker filed a class action in the United States District Court for the Eastern District of Pennsylvania against BNYM and its predecessor, JP Morgan Trust Co., asserting claims for negligence, and breaches of fiduciary and contractual duties for failing to perfect a security interest in the collateral backing the bonds.[20]   On November 10, 2011, in the Bankruptcy Court, Becker filed an objection to LBH's proposed plan on the ground that the third party release was "an impermissible, non-crucial, non-debtor third party release[]."[21]   He also asserted that the accompanying

---

[19] Bankr. Docket (Doc. Nos. 1207, 1208) (R. 11-12).

[20] *Becker v. Bank of New York, Mellon Trust Co.*, No. 11-CV-6460 (E.D. Pa. 2011).   On October 31, 2012, BNYM's motion to dismiss was granted as to the negligence claim.   *Id.* (Doc. No. 39).   BNYM's motion to dismiss the breach of fiduciary duty and contract claims were denied.   *Id.*   In its motion, BNYM argued that the settlement between LBH and BNYM precluded the Bondholders' claims in the class action. *Id.* at 12-13.   The court found these arguments "disingenuous and logically troubling" because the adversary proceeding involved different parties and did not arise from the same cause of action.   *Id.* at 13. Specifically, in the adversary proceeding, LBH sought a declaration that BNYM's lien had not been perfected.   In the class action, the Bondholders sued BNYM for failing to properly secure the bonds, resulting in a $17 million reduction of the Bondholders' claims.   *Id.*

[21] Objections of Leonard Becker to the Confirmation of the Debtors' First Amended Joint Chapter 11 Plan of Reorganization at 1, Bankr. Docket (Doc. No. 1443) (R. 35).

disclosure statement failed to clearly and conspicuously identify the third party release provision to the Bondholders, depriving them of a fair opportunity to object or vote against it.

On November 16, 2011, the Bankruptcy Court entered an order, *sua sponte*, severing the issue of whether the proposed plan should contain the third party release provision from the remainder of the proposed plan.[22]   Characterizing the order as a correction of a clerical error in its prior order dated September 14, 2011, the November 16 order specified that no portion of the September 14 order should be considered as waiving or releasing any claims that the Bondholders may have against BNYM.[23]

On December 7, 2011, the Bankruptcy Court confirmed the proposed plan without the third party release provision.[24]   Subsequently, on March 2, 2012, the Bankruptcy Court held a hearing to determine whether the third party release provision should be included in the confirmed plan of reorganization.   In a comprehensive opinion issued on May 10, 2012, Judge Frank concluded that the third party release could not be included because it had not been adequately disclosed or explained to the Bondholders.   Judge Frank rejected BNYM's contention that the adequacy of the disclosures should not be revisited because that issue was resolved when the order approving the settlement was entered on September 14, 2011.[25]

---

[22]  Order, Bankr. Docket (Doc. No. 1457) (Nov. 16, 2011) (R. 40).

[23]  *Id.*  In an order dated December 7, 2011, the Bankruptcy Court reinstated the September 14, 2011, order, deleting the finding regarding the third party release.   Order, Bankr. Docket (Doc. No. 1542) (Dec. 7, 2011) (R. 60).

[24]  Order, Bankr. Docket (Doc. No. 1538) (Dec. 7, 2011) (R. 59).

[25]  The May 10, 2012 order provisionally struck the third party release from the plan of

In this appeal, BNYM challenges the Bankruptcy Court's finding that the notice to the Bondholders of the third party release was inadequate.[26]   It contends that notice was adequate because it was provided to the Bondholders numerous times.   Specifically, in addition to the disclosures made pursuant to the Bankruptcy Code, BNYM provided the Bondholders with eight notices of the developments in LBH's bankruptcy, including the adversary proceeding.   Some of those notices attached the settlement stipulation and the summary of the terms, which included the third party release.   BNYM also argues that the Bondholders consented to the third party release when they failed to object to the motion to confirm the settlement stipulation.   Finally, BNYM contends that the third party release was an essential component of a global settlement that was both fair and equitable to the Bondholders, and necessary to the success of LBH's reorganization, satisfying the standards for approval of non-consensual third party releases in Chapter 11 reorganization plans.

In response, Becker urges affirmation of the Bankruptcy Court's findings.   He contends that the third party release "cannot be valid unless it comports with the requirements of Federal Rule of Bankruptcy Procedure 3016(c)," which it does not.[27]   Alternatively, he argues that the Bankruptcy Court lacks subject matter jurisdiction to enter an order approving the third party release because it affects the legal relationship

---

reorganization.   Bankr. Docket (Doc. No. 2041) (R. 2).   After a hearing, the Bankruptcy Court entered an order on May 24, 2012 that "reaffirmed" the court's denial of confirmation of the section of the plan that included the third party release, and declared the order ""FINAL."   Bankr. Docket (Doc. No. 2078) (R. 86).

[26] BNYM filed two separate notices of appeal from the two Bankruptcy Court orders, which were docketed as two different actions in this court.   *See* No. 12-CV-3752, E.D. Pa. 2012.   On July 9, 2012, the two actions were consolidated.   (Doc. No. 3).

[27] Br. of the Appellee at 19 (Doc. No. 27).

between two non-debtors.

## Standard of Review

The district court reviews the bankruptcy court's "legal determinations *de novo*, its factual findings for clear error[,] and its exercise of discretion for abuse thereof." *In re Reilly*, 534 F.3d 173, 175 (3d Cir. 2008) (quoting *In re Trans World Airlines, Inc.*, 145 F.3d 124, 130-31 (3d Cir. 1998)), *rev'd on other grounds*, *Schwab v. Reilly*, __ U.S. __, 130 S. Ct. 2652 (2010).   Where the bankruptcy court's decision involves a mixed question of law and fact, the district court must segregate the legal and factual determinations, and apply the appropriate standard of review to each.   *In re Montgomery Ward Holding Corp.*, 326 F.3d 383, 387 (3d Cir. 2003).

The bankruptcy court's factual findings will not be disturbed unless they are clearly erroneous.   *In re IT Grp., Inc.*, 448 F.3d 661, 667 (3d Cir. 2006); Fed. R. Bankr. P. 8013. A factual finding is clearly erroneous if the district court is firmly convinced, based on all the evidence, that the bankruptcy court made a mistake.   *Gordon v. Lewistown Hosp.*, 423 F.3d 184 (3d Cir. 2005); Fed. R. Bankr. P. 8013 advisory committee's note (according the same weight to a bankruptcy judge's findings as that given the findings of a district judge under Fed. R. Civ. P. 52(a)).   The district court may not engage in independent fact finding.   *In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 210 n.19 (3d Cir. 1995) (citing 28 U.S.C. § 158(a)).   In reviewing factual findings, the district court must give due regard to the bankruptcy judge's opportunity to observe the demeanor and credibility of witnesses. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500 (1984); *In re Myers*, 491 F.3d 120, 126 (3d Cir. 2007) ("The Bankruptcy Court is best positioned to assess the facts, particularly those related to credibility and purpose."); Fed. R. Bankr. P. 8013

("[D]ue regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.").

The bankruptcy court's conclusions of law are reviewed under the less deferential *de novo* standard.   *In re Goody's Family Clothing, Inc.*, 610 F.3d 812, 816 (3d Cir. 2010) (internal citation omitted).   Under the *de novo* standard, the district court makes a judgment independent of the bankruptcy court, without deference to that court's analysis and conclusions of law.   *Scimeca v. Umanoff*, 169 B.R. 536, 541-42 (D.N.J. 1993), *aff'd*, 30 F.3d 1488 (3d Cir. 1994).

## Discussion

### *The Bankruptcy Court had subject matter jurisdiction to approve the third party release as part of the plan of reorganization.*

Before considering BNYM's challenge to the Bankruptcy Court's finding that the notice of the third party release was inadequate, we must determine that the Bankruptcy Court had subject matter jurisdiction to approve the third party release as part of the plan of reorganization.[28]   This inquiry requires us to determine whether, by virtue of the indemnification agreement between LBH and BNYM, the purported third party release between the Bondholders and BNYM, as the indenture trustee, is "related to" LBH's

---

[28] Like the Bankruptcy Court, we believe the issue of whether the third party release is a permissible plan provision may be one of substantive bankruptcy law, not one of subject matter jurisdiction. *In re Lower Bucks Hosp.*, 471 B.R. at 448 n.45.   The third party release issue arose as part of the plan confirmation process, which is considered a "core proceeding" under the Bankruptcy Code.   28 U.S.C. § 157(b)(2)(L).   Additionally, whether conducted as part of a jurisdictional or substantive inquiry, the fact finding process is the same.   In both instances, the bankruptcy court has to examine the subject matter of the release, including the parties and the actions involved, in order to determine any potential effects it will have on the debtor's reorganization.   But, because Becker argued and continues to argue, that the Bankruptcy Court lacked subject matter jurisdiction to approve the third party release, and the Bankruptcy Court recognized that it has "an independent duty to satisfy itself that it has subject matter jurisdiction over any pending matter before reaching the merits of a case," *In re Lower Bucks Hosp.*, 471 B.R. at 447 n.44, we too examine the Bankruptcy Court's subject matter jurisdiction.

bankruptcy.[29]

We conclude that the Bankruptcy Court had "related to" jurisdiction over the third party release provision as part of LBH's plan of reorganization.   This is because the filing of the class action against BNYM had an immediate effect on LBH's bankruptcy estate when it triggered BNYM's claim for defense costs against LBH.

A bankruptcy court has subject matter jurisdiction over "'all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11,' 28 U.S.C. § 157(b)(1) (collectively known as 'core proceedings'), and . . . 'a proceeding that is not a core proceeding but that is otherwise related to a case under title 11,' 28 U.S.C. § 157(c)(1) ('non-core proceedings')."   *In re Mullarkey*, 536 F.3d 215, 221 (3d Cir. 2008).[30]

"Arising under" refers to those causes of action specifically created by the bankruptcy statute.   "Arising in" cases involve the administration of the bankruptcy estate.   *See*, *e.g.*, *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 267 (3d Cir. 1991). A "related to" case does not invoke a substantive right under the bankruptcy statute and exists outside of bankruptcy, but its outcome could conceivably have an effect on the bankruptcy estate.   *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984), *overruled on other grounds by Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 129 (1995).

---

[29] Subject matter jurisdiction is reviewed *de novo*.   *Shaffer v. GTE N., Inc.*, 284 F.3d 500, 502 (3d Cir. 2002).

[30] "[T]he core/non-core distinction is relevant to the scope of the bankruptcy court's powers . . . in core proceedings, the bankruptcy judge may issue final orders and judgments. . . . In non-core proceedings, the bankruptcy court's powers are more circumscribed: it must submit 'proposed findings of fact and conclusions of law' to the district court, which enters an order only after conducting *de novo* review." *Mullarkey*, 536 F.3d at 221 (citations omitted).

The subject matter of the third party release – the claims asserted by the Bondholders in the class action – is not founded on any bankruptcy statute.   Nor does it directly involve the administration of the bankruptcy estate.   Thus, because the class action does not "arise under" or "arise in" bankruptcy, the Bankruptcy Court had subject matter jurisdiction only if the Bondholders' claims in the class action are "related to" LBH's bankruptcy.

The test for establishing "related to" jurisdiction was articulated in *Pacor, Inc. v. Higgins.*   743 F.2d at 994.   In *Pacor*, the Third Circuit held that "[a]n action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action . . . which in any way impacts upon the handling and administration of the bankrupt estate."   *Id.*   However, potential, rather than actual, impact upon the bankruptcy estate is insufficient.   A party's inchoate claim of indemnity against a debtor is not, in and of itself, enough to establish the bankruptcy court's subject matter jurisdiction over an action brought against that party.   *Id.* at 995;[31]  *Steel Workers Pension Trust v. Citigroup, Inc.*, 295 B.R. 747, 750 (E.D. Pa. 2003).

Eighteen years later, in *In re Federal-Mogul Global, Inc.*, 300 F.3d 368 (3d Cir. 2002), the Third Circuit rejected an absolute rule that whenever there is an indemnification agreement, "related to" jurisdiction is automatically established.   It reiterated that "[t]he test articulated in *Pacor* . . . inquires whether the allegedly related

---

[31] The plaintiffs in *Pacor* filed suit against Pacor in state court, seeking damages for asbestos exposure.   *Pacor*, 743 F.2d at 986.   Pacor subsequently filed a third party complaint against the manufacturer of the chemical supplies containing asbestos, Johns-Manville, which was in bankruptcy, and removed the case to district court.   *Id.*   The district court remanded the matter, holding that the underlying suit was not "related to" the bankruptcy proceeding because "any judgment received by the plaintiff . . . could not itself result in even a contingent claim against [the Debtor], since Pacor would still be obligated to bring an entirely separate proceeding to receive indemnification."   *Id.* at 995.

lawsuit would affect the bankruptcy proceeding without the intervention of yet another lawsuit." *Id.* at 382.   Accordingly, the court found no "related to" subject matter jurisdiction to enjoin an action by a third party against a non-debtor because the non-debtor's indemnification claim against the debtor had "not yet accrued and would require another lawsuit before [it] could have an impact on [the debtor's] bankruptcy proceeding." *Id.*

More recently, in *In re W.R. Grace & Co.*, 591 F.3d 164, 175 (3d Cir. 2009), the Third Circuit once again reiterated the rule of "related to" jurisdiction in the context of an indemnification claim.   In *W.R. Grace*, the court held that a bankruptcy court lacked jurisdiction to enjoin state court actions by one non-debtor against another non-debtor, who held only a potential common law indemnification claim against the debtor.   *Id.* at 173.[32]   The court factually compared *W.R. Grace* to *Pacor, Federal-Mogul,* and *Combustion Engineering*,[33] stating that "our recently reaffirmed precedent dictates that a bankruptcy court lacks subject matter jurisdiction over a third-party action if the only way

---

[32] Courts of appeals in two other circuits have reached the opposite conclusion, holding that bankruptcy courts have "related to" jurisdiction to enjoin claims for indemnification or contribution arising out of third party litigation that could ultimately affect the debtor's estate and undermine the finality of the bankruptcy proceeding.   In *In re El Paso Refinery, L.P.*, the Fifth Circuit found bankruptcy court jurisdiction to enjoin third party litigation that would set off a "chain of indemnification provisions . . . leading directly to the [d]ebtor."   302 F.3d 343, 349 (5th Cir. 2002).   The Sixth Circuit reached the same result in *In re Wolverine Radio Co.*, 930 F.2d 1132, 1143 (6th Cir. 1991).

[33] In *Combustion Engineering*, the debtor argued that there was a unity of interest between the debtor and its non-debtor affiliates, based on the debtor's potential indemnity obligations to the affiliates and the existence of both a shared production site and shared insurance.   *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 227-33 (3d Cir. 2004).   The debtor further argued that the "unity of interest" provided sufficient basis for "related to" jurisdiction to permit the court to enjoin an action by a third party against the non-debtor affiliates.   *Id.* at 230.   The appellate court disagreed, rejecting the idea that shared insurance or a common production site was a "sufficient basis for the kind of 'unity of interest' that could give rise to 'related to' jurisdiction" and holding that "any indemnification claims against Combustion Engineering . . . would require the intervention of another lawsuit to affect the bankruptcy estate, and thus cannot provide a basis for 'related to' jurisdiction."   *Id.* at 232.

in which that third-party action could have an impact on the debtor's estate is through the intervention of yet another lawsuit." *Id.* at 173. Significantly, in distinguishing common law and contractual indemnification, the court clarified that it did "not mean to imply that contractual indemnity rights are in themselves sufficient to bring a dispute within the ambit of related-to jurisdiction." *Id.* at 174 n.9. That determination must be "developed on a fact-specific, case-by-case basis." *Id.*

These cases make clear that mere potential impact upon the debtor's estate is insufficient to invoke "related to" jurisdiction. Contingent indemnification liability will not suffice. The necessity of future action to fix a debtor's liability after resolution of a pending lawsuit precludes the exercise of "related to" jurisdiction.

The existence of an indemnification agreement between a defendant in a proceeding outside the bankruptcy action and a non-party bankrupt debtor does not automatically supply the nexus necessary for the exercise of "related to" jurisdiction. Only when the right to indemnification is clearly established and has accrued upon the filing of a civil action is the proceeding deemed "related to" the bankruptcy case. But, where the right to indemnification is contingent on a factual finding in an action not involving the bankruptcy debtor and requires the commencement of another lawsuit to establish that right, there is no effect on the bankruptcy estate and thus no "related to" jurisdiction. *In re Federal-Mogul Global, Inc.*, 300 F.3d at 382.

Here, the Bankruptcy Court, citing *W.R. Grace*, correctly concluded that it had "related to" jurisdiction because LBH's contractual duty of indemnification owed to BNYM supplied the necessary nexus between the claims in the class action and LBH's bankruptcy. *In re Lower Bucks Hosp.*, 471 B.R. at 449. Examining the Loan and

14

Security Agreement and the Trust Indenture, the Bankruptcy Court found that if Becker's class action were successful, LBH would be obligated to indemnify BNYM for its liability and defense expenses.   *Id.*[34]   Thus, according to the Bankruptcy Court, BNYM had, as a result of the contractual indemnification, "a potentially significant claim in the bankruptcy and create[d] the requisite nexus between Becker's class action claims against BNYM and LBH's reorganization."   *Id.*

*Pacor* and its progeny instruct us to ask two questions in determining whether there is "related to" jurisdiction.   *Steel Workers Pension Trust*, 295 B.R. at 753.   First, is LBH's indemnification liability triggered automatically upon the filing of the class action against BNYM?   Second, is a later successful lawsuit against LBH, after the resolution of the class action, a prerequisite to a finding of indemnification owing from LBH to BNYM? If the answer to the first question is no, or the answer to the second is yes, "related to" jurisdiction does not exist.   *Id.*

There are two agreements relevant to the indemnification issue.   The Loan and Security Agreement governs the relationship between LBH and the Authority.   The Trust Indenture defines the respective rights and obligations of the Authority and the Indenture Trustee, originally Continental Bank and later BNYM.   Each agreement references the other.

Section 11.03 of the Trust Indenture limits the liability of the Indenture Trustee to the Bondholders.   It provides, in relevant part, as follows:

<u>Trustee May Act Through Agents; Answerable Only for Wilful Misconduct or</u>

---

[34] As we discuss later, the Trust Indenture imposes an indemnification obligation on LBH to cover BNYM's defense costs whether the class action is successful or not.

> <u>Negligence.</u> . . . The Trustee shall not be answerable for the exercise of any discretion or power under this Indenture nor for anything whatever in connection with the trust hereunder, except only its own wilful misconduct or negligence.

Trust Indenture, § 11.03 at 62.[35]

Pursuant to section 11.4(b) of the Loan and Security Agreement, LBH agreed to indemnify the Authority against "any and all claims" arising out of the financing transaction.[36]   The scope of the indemnity is broad and requires LBH to assume and pay for the defense of any claim against the Authority.   It excludes only claims for "malfeasance or nonfeasance in office, bad faith, gross negligence, wilful misconduct, fraud or deceit."[37]   The indemnification provision, in relevant part, reads as follows:

> [LBH] will indemnify and hold harmless the Authority . . . against any and all claims, losses, damages or liabilities . . . to which the Authority . . . may become subject, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of a Project or are based upon any other alleged act or omission in connection with a Project by the Authority unless the losses, damages or liabilities arise from malfeasance or nonfeasance in office, bad faith, gross negligence, wilful misconduct, fraud or deceit of the member, officer or employee of the Authority.   In the event any such claim is made or action brought against the Authority . . . the Authority may direct [LBH] to assume the defense of the claim and any action brought thereon and pay all reasonable expenses incurred therein; or the Authority may assume the defense of any such claim or action, the reasonable costs of which shall be paid by [LBH] . . . .

---

[35] (R. 131).

In Count II of his class action complaint, Becker asserted a cause of action for negligence.   He alleged that BNYM owed the Bondholders a duty of care, "which duty of care included reasonable care to assure that the Bondholders' rights and interests were protected, including, in particular, that the Indenture Trustee's security interest in the Collateral for the benefit of the Bondholders was perfected."   *Becker v. Bank of New York, Mellon Trust Co.*, No. 11-CV-6460 (E.D. Pa. 2012), *Pl.'s Compl.* ¶ 37, Doc. No. 1.   On October 31, 2012, the court dismissed Becker's negligence claim.   *Id.* (Doc. No. 39).

[36] Loan and Security Agreement, § 11.4(b) at 52 (R. 132).

[37] *Id.*

Loan and Security Agreement, § 11.4(b) at 52-53.[38]

Later, in section 11.4(e) of the Loan and Security Agreement, LBH agreed to indemnify the Trustee, now BNYM as successor to Continental Bank, against "any liabilities" arising out of its powers and duties.[39]   The provision addresses liabilities caused by the Trustee's "gross negligence, or wilful misconduct."[40]   Section 11.4(e) provides:

> [LBH] shall indemnify the Trustee against any liabilities which it may incur in the exercise and performance of its powers and duties under the Indenture, provided that such liabilities are not caused by the gross negligence, or wilful misconduct of the Trustee, to the same extent and in the same manner as is described in subsection 11.4(b) . . . with respect to [LBH's] indemnity of the Authority.

Loan and Security Agreement, § 11.4(e) at 54.   Thus, section 11.4(e) describes the nature of the liabilities for which LBH must indemnify BNYM, and by reference to section 11.4(b), defines the scope of the indemnity obligation as the same as LBH owes the Authority.

Section 11.4(b) imposes an indemnity obligation regardless of whether the claims ultimately result in a finding of liability.   It covers "any and all claims, losses, damages or liabilities."   Section 11.4(e), on the other hand, fixes indemnification only once "liabilit[y]" has been established.   It does not cover claims that do not result in liability.   Thus, when read without reference to section 11.4(b), section 11.4(e) does not automatically impose a duty of indemnification because LBH's indemnification obligation would not arise until

---

[38]   The term "Project" is defined as "including the financing of the Cost" of constructing, improving, maintaining and operating the grounds and buildings.   Loan and Security Agreement, Article I at 18.

[39]   Loan and Security Agreement, § 11.4(e) at 54.

[40]   *Id.*

BNYM's liability is definitely determined in Becker's class action.  In other words, Becker would have to prevail in the class action before BNYM could rightfully demand indemnification from LBH.  This is the inchoate type of claim precluded by *Pacor*. *Pacor*, 743 F.3d at 995.  But, by reference to section 11.4(b), section 11.4(e) does indeed impose an obligation upon LBH to assume the defense and the expense of defending against claims, even though BNYM's liability has not yet been established. Section 11.4(e) defines the parameters of the obligation by using the phrase "to the same extent and in the same manner as is described in subsection 11.4(b)."   Requiring LBH to indemnify BNYM to the same extent and in the same manner as it must indemnify the Authority under section 11.4(b) means LBH must assume and pay for the defense of any claim other than for gross negligence or willful misconduct.[41]   Consequently, LBH's indemnification obligation, at least in part, was triggered upon the filing of the class action against BNYM; and, it is not contingent upon a finding of liability.   Therefore, the Bankruptcy Court had "related to" subject matter jurisdiction to rule on the third party release provision.

*The Bankruptcy Court did not err in concluding that*
*the notice provided to the Bondholders was inadequate.*

Having determined that the Bankruptcy Court had "related to" jurisdiction, we must decide whether it clearly erred in determining that the Bondholders were not provided adequate information concerning the third party release before they voted on the plan of reorganization.

Section 1125 of the Bankruptcy Code mandates that before creditors may be

---

[41]  Becker's complaint contains no allegations of gross negligence or willful misconduct.

solicited to vote on a plan of reorganization, the plan proponent must file a copy of the plan, or a summary of the plan, and a written disclosure statement to holders of claims and interests.   11 U.S.C. § 1125(b).   The disclosure statement must first be approved by the bankruptcy court "as containing adequate information."   *Id.*   "[A]dequate information" is defined as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that would enable a hypothetical investor typical of holders of claims or interests . . . of the relevant class to make an informed judgment about the plan . . . and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information . . . .

11 U.S.C. § 1125(a)(1).   What constitutes "adequate information" is determined on a case-by-case basis, with the ultimate determination within the discretion of the bankruptcy court.   *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1156-57 (5th Cir. 1988); *see also In re Aspen Limousine Serv. Inc.*, 193 B.R. 325, 334 (D. Colo. 1996) (holding that in reviewing the adequacy of a disclosure statement on appeal, the reviewing court considers whether the bankruptcy court has abused the broad discretion it has to consider the adequacy of the statement); *In re El Comandante Mgmt. Co.*, 359 B.R. 410, 414 (Bankr. D.P.R. 2006) ("Beyond the statutory guidelines described in Section 1125(a)(1), the decision to approve or reject a disclosure statement is within the discretion of the bankruptcy court.") (internal quotations and citations omitted).[42]   "Factual findings of the bankruptcy judge on 'core matters' such

---

[42]   In an effort to objectify the standard, some courts use a list of factors to determine the adequacy of information contained in a typical disclosure statement.   In *In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990), the bankruptcy court identified nineteen types of information that might be included in an adequate disclosure statement.   Among the factors are "information relevant to the risks being taken by the creditors and interest holders" and "any financial information, valuations, or *pro forma*

as the adequacy of disclosure under Section 1125(a) should be set aside on appeal by the district court only if those findings represent an abuse of discretion." *Kirk v. Texaco, Inc.*, 82 B.R. 678, 681 (S.D.N.Y. 1988) (citing *In re Snyder*, 56 B.R. 1007, 1009 (N.D. Ind. 1986)).

The bankruptcy court abuses its discretion when it makes factual findings that are "clearly erroneous." *See* Fed. R. Bankr. P. 8013. Thus, only if the finding was clearly erroneous will the Bankruptcy Court's finding that the disclosure statement did not provide "adequate information" within the meaning of Section 1125(a)(1) be set aside.[43]

Here, in reviewing the adequacy of the disclosure statement, the Bankruptcy Court meticulously analyzed the purpose of the third party release, the factors that the Bondholders needed to evaluate whether the global settlement was in their best interest, and the content of the disclosures. *In re Lower Bucks Hosp.*, 471 B.R. at 459. Based on its analysis, the Bankruptcy Court concluded that the Bondholders could not have made an "informed judgment about the plan" of reorganization because they had not been adequately informed. *Id.* n.61 (citing 11 U.S.C. § 1125(a)(1)).

---

projections that would be relevant to creditors' determinations of whether to accept or reject the plan." *Id.* (citation omitted).

[43] BNYM contends that adequacy of notice is a question of law, citing *Chemetron Corp. v. Jones*, 72 F.3d 341 (3d Cir. 1995). In *Chemetron*, the court of appeals determined that the bankruptcy court utilized an incorrect legal standard to determine whether creditors were unknown or known, for purpose of giving actual notice. *Id.* at 349-50. Accordingly, the appellate court reviewed the lower court's decision *de novo*. As Becker points out, *Chemetron* is distinguishable because the content of the notice itself was not at issue.

Becker counters that adequacy of notice is a question of fact, citing *Tenn-Fla. Partners v. First Union Nat'l Bank of Fla.*, 229 B.R. 720, 733 (W.D. Tenn. 1999), *aff'd*, 226 F.3d 746 (6th Cir. 2000). In *Tenn.-Fla. Partners*, the district court accepted the bankruptcy court's factual findings as not "clearly erroneous," including a determination that the debtor provided misleading and incomplete disclosures, but reviewed *de novo* the bankruptcy court's holding that the debtor's failure to disclose constituted fraud under applicable law. *Id.* at 733-35.

First, the Bankruptcy Court determined that the disclosure did not comply with Fed. R. Bankr. P. 3016(c), which requires a disclosure statement to "describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction."   *In re Lower Bucks Hosp.*, 471 B.R. at 459-60 (citing Fed. R. Bankr. P. 3016(c)).   It determined "there was nothing conspicuous regarding the disclosure of the Third Party Release in any of the documents sent to the Bondholders."   *Id.* at 460.   The Bankruptcy Court specifically found that the existence and significance of the third party release was obscured because it was embedded, without any emphasis, in the boilerplate release of claims against LBH.   *Id.*   It also noted that only the heading, "Release-Bond Documents," was in bold typeface, which by itself did not indicate "something out of the ordinary, *i.e.* anything other than the release of the Bondholders' rights against [LBH] under the Indenture."   *Id.*

BNYM misapprehends Rule 3016(c) when it argues that the phrase "bold, italic, or underlined text" is merely a parenthetical example of "conspicuous language" in the rule, and not a requirement.   BNYM argues "[i]f the Supreme Court had intended the interpretation of the text of Rule 3016 that Bankruptcy Court suggested in this case, it would have explicitly stated so – it would not have placed these words in parentheses."[44] Assuming BNYM is correct, it does not affect the Bankruptcy Court's conclusion.

---

[44] Br. of Appellant at 29.   *But see In re Armstrong World Indus., Inc.*, 348 B.R. 136, 158-59 (Bankr. D. Del. 2006) ("[T]he Plan and Disclosure Statement describe the [relevant considerations], specifically and in **conspicuous bold language**, in compliance with the requirements of Bankruptcy Rule 3016(c).") (emphasis added); *In re U.S. Mineral Prods. Co.*, No. 01-2471, 2005 WL 5898300, at *14 (Bankr. D. Del. Nov. 29, 2005) ("The Plan and the Disclosure Statement describe in specific and conspicuous language, **identified in bold-faced type**, all acts to be enjoined and the entities subject to the injunctions under the Plan, as required by Bankruptcy Rule 3016(c).") (emphasis added); *In re NII Holdings, Inc.*, 288 B.R. 356, 365 (Bankr. D. Del. 2002) ("In accordance with Bankruptcy Rule 3016(c), the Disclosure Statement describes in specific and **conspicuous italicized language** all acts to be enjoined and identifies the entities that would be subject to the injunction.") (emphasis added).

Whether Rule 3016(c) actually requires bold, italicized or underlined text is not dispositive.   The Bankruptcy Court considered other factors, including the placement of the third party release provision.   As characterized by the Bankruptcy Court, the disclosure statement "squandered the opportunity to mention the Third Party Release in several places where it was germane."   *In re Lower Bucks Hosp.*, 471 B.R. at 461.

Although it questioned BNYM's assumption that non-disclosure-statements may even be considered when determining the adequacy of a later disclosure statement, the Bankruptcy Court still considered, along with the disclosure statement, the number of notices sent to the Bondholders.   *Id.*   It concluded:

> There was nothing conspicuous regarding the disclosure of the Third Party Release in any of the documents sent to the Bondholders.   In both presentation and placement, the documents sent to the Bondholders did not differentiate the Third Party Release from any of the other information provided, and no effort was made to bring the existence of the Third Party Release to the eyes and attention of the Bondholders.

*Id.* at 460.   As the Bankruptcy Court further found, "the repetition of the same mistake made in the [Disclosure Statement] does not cure the Rule 3016(c) defect. . . .   If anything, the general similarity of the serial notices would make it less likely that the recipients would parse carefully any of the later documents."   *Id.* at 461.   It also determined that many of the notices contained an ambiguous term which did not differentiate indemnity claims against LBH from the Bondholders' claims against BNYM.   *Id.*   Finally, the Court noted that it is not the Bondholders' responsibility to "hunt" for a third party release provision.   *Id.*

At oral argument, BNYM's counsel encouraged us "to go back to the whole record"

22

and consider the nine separate notices sent to the Bondholders.[45]   A review of those notices does not reveal that BNYM disclosed what claims the Bondholders had and were giving up against BNYM.

The first notice, dated January 15, 2010, provided the Bondholders with notice of LBH's default of its obligations and LBH's bankruptcy filing.[46]   The second notice, dated June 16, 2010, reported that LBH commenced a proceeding against BNYM, and provided a summary of LBH's seven-count complaint.[47]   There is no description of the claims from which a bondholder could discern that BNYM was accused of failing to perfect the Bondholders' security interest and the effect that failure would have on the Bondholders' creditor status.   The next two notices, dated July 2, 2010 and August 5, 2010, merely reiterated that there was an adversary proceeding.[48]   They added no more information. The fifth notice, dated January 1, 2011, provided a procedural history of the adversary proceeding in general terms, without explaining the basis for LBH's claim that BNYM did not have a perfected security interest and what that meant to the Bondholders.[49]   In the next notice, dated March 23, 2011, there was brief mention that there were ongoing settlement negotiations.[50]   Later, in the notice, there was an invitation "to participate in a

---

[45] Hr'g Tr. 14:10-14:15 (Dec. 13, 2012).

[46] Decl. of Bridget Schessler in Resp. to the Objection of Leonard Becker to the Debtors' Plan of Reorganization, Ex. C, 10-10239, Doc. No. 1459 (R. 42).

[47] *Id.*, Ex. D.

[48] *Id.*, Exs. E-F.

[49] *Id.*, Ex. G.

[50] *Id.*, Ex. H.

discussion with respect to this account" in a scheduled conference call.[51]   However, there was nothing to indicate that among the topics to be discussed were the settlement proposals and the adversary proceeding.

In the seventh notice, dated May 13, 2011, BNYM reported that there was a proposed settlement between LBH and BNYM.[52]   It referenced that LBH, as a result of settlement discussions, proposed a plan for "treatment of the bonds in a chapter 11 plan."[53]   It advised that the Bondholders would "have the opportunity to vote on the proposal."[54]   Nothing in that notice disclosed that there was a potential claim against BNYM for failing to perfect the Bondholders' security interest and, more importantly, that BNYM was getting a release.

The eighth notice, dated August 16, 2011, was a seven-page, single-spaced document, with the settlement stipulation attached as an exhibit.[55]   It summarized the settlement terms between LBH and BNYM.   As to the release of BNYM, it stated that the settlement would include a release of "any and all claims against the Debtors, the Debtors' estates, and the Trustee by any and all parties, including without limitation all Bondholders . . . ."[56]   Again, as in prior notices, there is nothing to alert the Bondholders that there was a potential claim against BNYM for failure to perfect the security interest

---

[51] *Id.*, Ex. H at 6.

[52] *Id.*, Ex. I.

[53] *Id.*, Ex. I at 4.

[54] *Id.*, Ex. I at 4.

[55] *Id.*, Ex. J.

[56] *Id.*, Ex. J at 4-5.

that jeopardized the Bondholders' investment.

Significantly, in the last notice, dated October 14, 2011, BNYM reported that Becker had filed a motion to reconsider the settlement approval order, and that BNYM was intending to contest it.[57]   The notice did not explain the grounds for the motion or BNYM's rationale for opposing it.   As the Bankruptcy Court noted, BNYM sent this notice at the outset of the plan voting period.   *In re Lower Bucks Hosp.*, 471 B.R. at 440 n.27. It questioned why BNYM did not disclose this material information prior to the Bondholders' vote on a plan of reorganization which included a third party release that would have released all claims against BNYM.

In summary, none of the nine notices predating the disclosure statement described the Bondholders' potential claims against BNYM or explained what claims by the Bondholders against BNYM would be released.[58]   Contrary to BNYM's argument, there was insufficient information from which the Bondholders could have concluded that they had a potential claim against BNYM.

As the Bankruptcy Court observed:

> By referring to both the Bondholders' claims and the Indenture Trustee's indemnification claims as a single consolidated claim, BNYM created a significant ambiguity.   When BNYM 'disclosed' the Third Party Release in the August 16th Notice by referring to 'a release of any and all claims . . . against . . . the Trustee,' a Bondholder could easily have mistaken the words to refer to the Debtors' claims against BNYM and the

---

[57] *Id.*, Ex. K.

[58] At oral argument, BNYM's counsel conceded that the notices did not clearly indicate to the Bondholders that they had a viable claim against BNYM.   Hr'g Tr. 17:10-14 (Dec. 13, 2012).   However, he contended that "anyone reading the recitation of facts being a [B]ondholder should have been able to determine that they had a potential claim against [BNYM]."   *Id.* at 17:15-18; 60:9-15; 64:2-65:10.   He argued that each one of those notices described in detail the underlying claims and defenses in the adversary proceeding between BNYM and LBH, conveying the message that BNYM had "screwed up."   *Id.* at 64:2-7.

> Bondholders, rather than the Bondholders' potential claims against BNYM, particularly because nowhere in any of the . . . Notices did BNYM differentiate its indemnity claim against LBH from the Bondholders' claim under the Bonds.

*In re Lower Bucks Hosp.*, 471 B.R. at 461.

Significantly, the Bankruptcy Court found that the disclosure statement did not provide the Bondholders with information about the merits or value of the potential claims against BNYM in the class action that they would be relinquishing. *Id.* at 459. Consequently, the Bondholders could not evaluate whether the benefits of the proposed plan outweighed what they would give up by agreeing to the third party release.

Becker contends that "conspicuously absent" from the disclosure statement was information bearing on "(3) whether there was potential conflict in the Bond Trustee negotiating for its own release" and "(5) what consideration the Bond Trustee was giving for the Third Party Release."[59]   What is clear is that BNYM agreed to release its contractual right of indemnification against LBH in return for the third party release because of "the impending discharge of its indemnification rights" against LBH.   *In re Lower Bucks Hosp.*, 471 B.R. at 451.   What claims the Bondholders were releasing against BNYM is not clearly described in the disclosure notice or the separate nine notices.   It is also unclear what exactly the Bondholders would receive in exchange for releasing their claims against BNYM.   Bondholders had certain rights under the indenture agreement.   The disclosures did not clearly detail what they were and why the release of BNYM was necessary.

In summary, the Bankruptcy Court engaged in a careful and thorough analysis of

---

[59]  Br. of the Appellee at 17.

26

the factors bearing on the adequacy of disclosures provided to the Bondholders.   It did not abuse its discretion when it found that the disclosure statement did not adequately communicate the specifics of the settlement, but rather, obscured the existence and significance of the third party release provision.   We agree with the Bankruptcy Court that the information provided was not adequate to enable a reasonable creditor to make an informed judgment about the plan, particularly the release of BNYM.   Accordingly, the Bankruptcy Court's finding that the disclosure statement did not contain "adequate information" as required by Section 1125(a) is not clearly erroneous.

*The Bankruptcy Court correctly concluded that the Bondholders*
*did not consent to the third party release through the settlement motion process.*

BNYM contends, without elaboration and citation to authority, that the Bondholders consented to the third party release when they did not object to it in the settlement motion process.   However, as the Bankruptcy Court and Becker correctly point out, the settlement stipulation "was not a stand-alone agreement that was complete and enforceable upon court approval."   *In re Lower Bucks Hosp.*, 471 B.R. at 457; Br. of the Appellee at 12.   It was not self-executing.   It was provisional.   The settlement was conditioned upon confirmation of the plan of reorganization and on the effective date of the plan.   The Bankruptcy Court's September 14, 2011 order also provided that the Bondholders' claims would be released "upon the Plan Effective Date."[60]   In fact, during the December 2, 2011 confirmation hearing, the Bankruptcy Court clarified that the settlement was not "so final" as to preclude its review during confirmation.[61]   Further,

---

[60] Order Granting Motion of Debtors for Approval of Stipulation Resolving Adversary Proceeding at 3, Bankr. Docket (Doc. No. 1320) (R. 23).

[61] The Court:

during the March 2, 2012 hearing, BNYM's counsel "effectively" conceded that the final treatment of the Bondholders could be accomplished only through the plan confirmation process. *In re Lower Bucks Hosp.*, 471 B.R. at 457 n.54. Therefore, until all requirements, including adequate disclosure, were satisfied and the plan was confirmed, the settlement stipulation, including the third party release, did not become effective.

Prior to confirmation of the plan, the Bankruptcy Court severed the third party release provision. At the same time, it ruled that nothing in its September 14, 2011 order constituted a waiver, release, discharge, or impairment of any claims that the Bondholders may have against BNYM. *Id.* at 441. Later, after a hearing on March 2, 2012, it provisionally struck the third party release from the plan. Finally, in its May 24, 2012 Order, it struck the release from the reorganization plan. Thus, the provisional settlement stipulation never survived as part of the plan.

Adopting BNYM's argument that the Bondholders' failure to object to the settlement stipulation constituted acceptance would render the notice requirements superfluous. The purpose of giving Section 1125 notice is to assure that those acting have sufficient information to make an informed judgment about the plan. Here, if the

---

I thought there was some argument being made in the bond trustee's papers that the settlement is so final that it's off the table at confirmation. That it's been approved, it was approved on notice, put aside how good the notice was for the time being, and therefore that issue was resolved, and it doesn't arise again in confirmation.
        That is not what I'm hearing right now, and I just want to be sure again, that everyone is on the same page. . . .
        You're not saying that there's a kind of preclusion here. That the entry of the approval order on the settlement means that *ipso-facto*, a plan that includes this passes muster under 1129? . . .
        I just want to make sure you're not asserting that somehow approval of the settlement makes it inappropriate to consider those two [consensual release] issues at confirmation.
Mr. Schell: "No, Your Honor, no no."

Hr'g Tr. 27:3-37:7 (Dec. 2, 2011) (R. 91).

Bondholders had not been given adequate notice of the ramifications of the release as a component of the plan, they could not have knowingly agreed to its terms.

*The Bankruptcy Court did not err in concluding that the third party release was an impressible non-consensual release.*

BNYM contends that even if the impermissible release was not consensual, it should still be approved because it was an essential component of a global settlement that was fair and equitable to the Bondholders, and necessary to the success of the LBH's reorganization.[62]

In *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000), the Third Circuit addressed the issue of the validity of releases of third party claims against non-debtors. It reviewed the decisions of several other circuits, some of which allowed them in limited circumstances and others which disallowed them.  Recognizing that an injunction or release is "extraordinary protection" for non-debtor parties, the court declined to establish a "blanket rule" permitting or proscribing non-debtor releases.  *Id.* at 217.[63]  Instead, without deciding the issue, it prognosticated that "there are circumstances under which [it] might validate a non-consensual release that is both necessary and given in exchange for fair consideration."  *Id.* at 214 n.11.

At the same time, it identified the "hallmarks of permissible non-consensual releases – fairness, necessity to the reorganization, and specific factual findings to

---

[62] Br. of Appellant at 36.

[63] The three extraordinary cases that the *Continental* court analyzed were all decided prior to the addition of Section 524(g) to the Bankruptcy Code in 1994.   *See In re Drexel Burnham Lambert Grp.*, 960 F.2d 285 (2d Cir. 1992); *In re A.H. Robins Co.*, 880 F.2d 694 (4th Cir. 1989); *In re Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).   The Bankruptcy Code now provides protection to particular non-debtors parties in asbestos cases, as delineated in Section 524(g)(4).   Congress presumably did not intend to include others.

support these conclusions." *Id.* at 214. It also considered whether reasonable consideration had been given in exchange for the release. *Id.* at 215.

To determine whether or not a release is necessary to the reorganization, the plan's proponent must demonstrate that there is a relationship between the debtors' successful reorganization and the non-consensual parties' release, and that "'the releasees have provided a critical financial contribution to the debtors' plan that is necessary to make the plan feasible in exchange for receiving a release of liability.'" *In re Nickels Midway Pier, LLC*, No. 03-49462, 2010 WL 2034542, at *13 (Bankr. D.N.J. May 21, 2010) (quoting *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 608 (Bankr. D. Del. 2000)). To determine whether the release is fair, BNYM must demonstrate that the "non-consenting creditors [the Bondholders] were given reasonable consideration in exchange for the release." *Id.*

In *In re South Canaan Cellular Invs., Inc.*, 427 B.R. 44, 72 (Bankr. E.D. Pa. 2010), the bankruptcy court evaluated whether a non-consensual release satisfied the *Continental* "hallmarks." It considered whether: (1) the third party to be protected by the release had made an important contribution to the reorganization; (2) the requested release was "essential" to the confirmation of the plan; (3) a large majority of the creditors in the case had approved the plan; (4) there was a close connection between the case against the third party and the case against the debtor; and (5) the plan provided for payment of substantially all of the claims affected by the release. *Id.*

In this case, BNYM urged the Bankruptcy Court to approve the non-consensual release, arguing that all five factors had been satisfied. The Bankruptcy Court determined that "[w]hile the record conceivably could support favorable findings to BNYM

on the first, second, fourth, and perhaps, fifth factors, I am unable to make the requisite finding on the third factor."   *In re Lower Bucks Hosp.*, 471 B.R. at 462.   Because the pre-solicitation disclosure was inadequate, the Bankruptcy Court lacked "sufficient confidence that a large percentage of the Bondholders (in both number and amount of claims) who voted to accept the Plan understood that they would be releasing their claims against BNYM."   *Id.*   Indeed, if notice was inadequate, any purported approval by the creditors was consequently uninformed and unknowing.   Similarly, inadequate notice could also explain why the Bondholders holding half the value of the bonds did not vote on the plan.

First, we analyze the consideration provided by BNYM in exchange for the release. In doing so, we are guided by the Bankruptcy Court's careful analysis of BNYM's actions and role during the settlement negotiations.   LBH commenced an adversary proceeding against BNYM, contending that it had failed to file the financing statements essential to preserving the Bondholders' status as secured creditors.   Throughout the proceedings, BNYM appeared to argue that due to its willingness to participate in the settlement negotiations on behalf of the Bondholders, it had an unconditional right to condition its decision to settle with LBH on the inclusion of the third party release provision.   *In re Lower Bucks Hosp.*, 471 B.R. at 452.   Specifically, BNYM contended that there could be no settlement without its participation and agreement.   Calling it "the most provocative contention," the Bankruptcy Court flatly rejected this argument, pointing out that despite its critical role in the settlement negotiations, BNYM never had a "legal right to put [its own interest] ahead of the interests of the Bondholders."   *Id.* at 452-53.

BNYM further contends that it made substantial contributions to the Debtor's

reorganization by giving up its right to indemnification against LBH.   As discussed, unless and until Becker prevails in the class action, the only claim BNYM gave up was for defense costs.   However, and as the Bankruptcy Court pointed out, it is not clear that this claim would get administrative-expense priority.   *Id.* at 454.   Neither the Loan Agreement nor the Trust Indenture contain any provisions that would grant BNYM an unconditional charging lien for defense costs.   *Id.*   Undoubtedly, the claim, if allowed, would dilute the recoveries of other general creditors.   However, it is not clear that it is large enough to merit approval of a non-consensual release.

BNYM also argues that the third party release was "absolutely necessary" to LBH's reorganization because its indemnification claim would have precluded LBH's successful emergence from bankruptcy.[64]   Specifically, according to BNYM, LBH could not move forward until the claims were resolved, delaying Chapter 7 liquidation.[65]   The Bankruptcy Court noted that BNYM was in a position to place obstacles in the way of the reorganization.   *In re Lower Bucks Hosp.*, 471 B.R. at 456.   Accordingly, its support "in its capacity as indemnitee, was important, perhaps even essential, to the success of the reorganization."   *Id.* (emphasis removed).   Indeed, the Court opined that in exchange for BNYM's support, some Bondholders could have acceded to the third party release. Alternatively, some Bondholders could have rejected the global settlement and "roll[ed]

---

[64] Br. of Appellant at 42.

[65] *Id.*   At oral argument, BNYM argued that had litigation not settled, the assets of the bankruptcy estate would have been consumed by the litigation and the ability of LBH to reorganize would have been jeopardized.   Hr'g Tr. 4:11-22 (Dec. 13, 2012).   According to BNYM, the plan release was "important" and a "normal part of any settlement of this type.   Because the settlement required that the indenture trustee release its right to be indemnified by the debtor, it was only natural that the actions against the indenture trustee for which trustee would have been indemnified be released as well."   *Id.* at 4:20-5:1.

In response, Becker's counsel pointed out that if the release was as important as BNYM contends it was, it would have been made a condition of confirmation of the plan.   *Id.* at 45:18-24.

the dice on the option of litigation against BNYM." *Id.*   However, the Bondholders never got an opportunity to make an assessment of the alternatives available to them because the disclosures they received were inadequate.

With respect to what consideration the Bondholders received in exchange for the third party release, there is no evidence from which one could conclude whether any was given; or, if it was given, whether it was adequate.   Pursuant to the settlement agreement, the Bondholders were to receive $8.15 million from LBH in exchange for a release of any claims against LBH.   There is no indication that BNYM itself gave any consideration or compensation to the Bondholders.   Therefore, it appears that BNYM included the settlement provision to shield itself from liability in connection with its obligation to the Bondholders in the adversary proceeding and for its prepetition conduct without having given any consideration.

In summary, the Bankruptcy Court did not err in concluding that the *Continental* hallmarks of permissible non-consensual releases were not present in this case.

## Conclusion

The Bankruptcy Court, which had "related to" jurisdiction to rule on the third party release, did not abuse its discretion in holding that the third party release provision was inadequately disclosed.   Therefore, we shall affirm the Bankruptcy Court.